times the maximum weight required to be dependent therefrom or placed thereon." That what before this enactment had been construed to be a mere detail of the work is now an absolute duty resting upon the master. See McLaughlin v. Eidlitz, 50 App. Div. 518, 64 N. Y. Supp. 193; Stewart v. Ferguson, 164 N. Y. 553, 58 N. E. 662. There has been no motion for a new trial in this case, and the only question for us to consider is the exceptions, and ascertain if the plaintiff has an exception which raises the point now urged upon us. The court states in his main charge that the plaintiff had no right to assume the scaffolding was safe, and this was excepted to, and certainly that does not raise the question. The next is the request relating to latent defects about which there was no proof, and the labor law was not then in the mind of the counsel. And the last exceptions pertain to the capacity in which Brown, the foreman, was acting at the time,—whether a co-employé; also as to the effect of his direction to the plaintiff to go upon the staging. There is nothing in any of the requests containing a hint to the trial judge that the counsel was seeking to recover because of the failure of the defendant to meet the conditions imposed upon it by the statute mentioned. The action was commenced and tried throughout without any intimation that any different liability attached to the defendant than would have been applicable had this statute never been enacted. Upon the trial the controverted question of fact was whether the defendant had furnished suitable planks available to its workmen for the temporary staging. Had it fulfilled its duty to the plaintiff by providing a proper place for him to do the work which it assigned him to perform? After having tendered that issue, and been unsuccessful, it is too late for the plaintiff upon this appeal to inject into his case another distinct element adding to the liability of the defendant, and which it has never been called upon to meet. Where a case has been tried upon a definite line, the appellate court cannot grant a new trial upon the assumption that the plaintiff might have succeeded had another theory been adopted, but which was not suggested upon the trial. The judgment should be affirmed, with costs to the respondent.

Judgment affirmed, with costs. All concur.

---

(64 App. Div. 150.)

## WALTERS v. SYRACUSE RAPID-TRANSIT RY. CO.

(Supreme Court, Appellate Division, Fourth Department. July 23, 1901.)

NEGLIGENCE—PERSONAL INJURIES—ELECTRIC WIRES—EVIDENCE.

Plaintiff testified that while riding a bicycle on the street he received a severe electric shock from a falling strain wire connected with defendant's trolley wire. Defendant's linemen testified that the broken wire was not charged, and that they mended it with their bare hands, and the manner of its attachment to the trolley wire tended to show that it could not have been charged. The testimony of electricians was that plaintiff could not have received a shock therefrom while riding a rubber-tire wheel on a dry asphalt pavement. *Held*, that a verdict for plaintiff could not stand.

Appeal from trial term, Onondaga county.

Action by Charles Walters against the Syracuse Rapid-Transit Railway Company. From a judgment for plaintiff, defendant appeals. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and RUMSEY, JJ.

Charles E. Spencer, for appellant.
John H. McCrahon, for respondent.

SPRING, J. The plaintiff claims to have been injured by coming in contact with a suspended wire charged with electricity, belonging to the defendant, and forming a part of its street-railway system in the city of Syracuse. The story of the plaintiff is that on the 17th day of June, 1898, while he was riding his bicycle along North Salina street, in that city, and while near the school building known as the "Sacred Heart School," a wire fell, "striking me in the right eye and on the left wrist, throwing me to the pavement, and burning my eye and on the left wrist. * * * I received a shock throwing me off my wheel." There was a piece of strain wire connecting with the trolley wire, and reaching to an iron post in front of the school building. Plaintiff, in describing it, said: "It laid on the pavement, and the other end was dangling up in front of me, hanging from the trolley wire." Continuing his narration, he testified that he went to his home, riding his wheel, but alighting and resting on the way; that his heart pained him from the first; that after about two weeks Dr. Moore was called, and has treated him since. The only witness who tends to support his claim as to the cause of the accident is a barber named Renaud, whose shop was on this street near where the plaintiff claims the accident occurred. Renaud testified he saw a man fall violently at this time on the place indicated by the plaintiff as that of the injury. He noticed one piece of wire "hanging down * * * about in the middle of the first track north. The other piece laid over across the gutter. * * * All I could see when it came down over the gutter, it might have been three and one-half or four feet. This other piece came directly from the trolley wire. It looked to me as though it hung there. * * * I could reach it easily enough. * * * It did not come down to the ground." The proofs of the defendant seriously impugn the truthfulness of the plaintiff's story. Two witnesses, who are wire repairers in the employ of the defendant, testified to repairing a wire at this point on this day, and they assert positively that it was not a live wire. Balway, who reached the place ahead of his fellow workman, said that the piece had dropped down, and been wound around a stone hitching post; that he unwound it and straightened it out with his bare hands. And Breed, the other repairer, also testified to the situation of the wire, and that he handled it, and felt no electricity in it. This street is covered with asphalt pavement, and between the gutters is 40 feet in width, with an unimpeded space of 13 feet between each outer rail of the defendant's track and the curb. The plaintiff testified with must positiveness that the asphalt was "absolutely dry," and his own statement is

that it was a "nice day," and this is corroborated by the records of the weather bureau of Syracuse. Several electrical experts testified that asphalt, when dry, is a nonconductor of electricity, and that the concrete which forms the base of this pavement is also a nonconductor in that state, as is the rubber which was the tiring of the wheels of plaintiff's bicycle. While this may, in a measure, be expert testimony, yet the witnesses testified to a scientific fact, and their testimony is entirely undisputed. It is proved that this trolley wire carried not to exceed 550 volts of electricity. One of the electrical experts testified to experiments in testing the effect of electricity upon asphalt where he subjected a piece of one-fourth of one inch in thickness to a current of 20,000 voltage without any conduction. It was wholly impervious to the current. We have, therefore, the undisputed evidence that the plaintiff was riding on a dry asphalt pavement, concededly a nonconductor of electricity, and upon a wheel with tires of rubber, also a nontransmitter of the electrical current; and, if this is the true condition, contact with the exposed wire charged with electricity would not be fraught with any danger from that agency. There must be an uninterrupted circuit of the current to enable the electricity to flow. If one pole is a nonconductor, the circuit is checked, and no shock will follow, however heavily charged and bare may be the wire. Again, considerable evidence was given on behalf of the defendant tending to show it was a physical impossibility for the plaintiff to receive a shock from this strain wire. That wire was not intended to be charged with electricity. Two line repairers—Breed and Balway—vouched for its insulation. Clarke, the chief engineer of the defendant, who was called as a witness for the plaintiff, testified on cross-examination to the connection of the strain wire with the trolley line, and the method of construction, as follows:

"Beginning at the trolley wire, there is from three to four feet of steel wire. Then follows a composition placed there as an insulator. That composition is a patented article, and I can't describe what it is made of. It is a secret process, but made by several manufacturers. It is usually round in shape, with an eye bolt protruding from either side. That is a nonconductor of electricity. From this insulator, which is about from three feet to four feet from the trolley wire, there is an iron wire running towards the pole, and separated from the pole cap by an insulator, which is fastened to the pole. That insulator is an ordinary spool, you may say,—spool, I think, it is in this case. The spool is of composition material. It is a regular spool. That is what it is. Just the same shape as a spool thread is on. An iron ring goes through the pole, and a bolt goes through the iron ring, through the spool. The bolt is iron. The span wire sets in the groove of the spool, around the outside of the spool; so that the span wire does not come in contact with either the pole or this bolt that goes through the spool."

Connette, the manager of the defendant, and an experienced expert in electricity in its use on trolley lines, testified there were two insulators between this strain-wire connection and the pole top. One is a ball insulator, a patented contrivance, which is a composition of various ingredients, and the other called a "spool insulator," made of lignum vitæ; that these insulators are in general use, and as satisfactory as any known in the business. No

impeachment was given to this proof that the method of construction rendered it impossible for the accident to have happened by contact with this strain wire as testified to by the plaintiff. There are other circumstances which tend to weaken the plaintiff's story. He never made any complaint to the defendant, or presented any claim to it, nor did he employ an attorney or bring his action until about 14 months had elapsed from the time he asserts the injuries were inflicted upon him. Two or three personal friends, who were with him on various occasions, testified he never intimated that he had received or was suffering from any injuries, and he never mentioned the accident which is now the basis of his large claim. He testified he was burned on the wrist and eye, yet no one testified to any scars or evidence of burns; and at the time of the examinations by the physicians—even by Dr. Moore—there was no outward trace of contact with an electrical wire. A shock which would cause the permanent results with which he insists he is afflicted, and of sufficient force to knock him violently from his wheel, would be apt to produce some abrasion or scorching. There is a radical disagreement among the physicians as to the extent of his heart difficulty, not arising from varying theories, but from physical examinations of the plaintiff. Drs. Moore and McMorrow testified that his heart was out of position; that it was enlarged; that it revealed a noticeable mitral murmur; that there was a physical derangement existing, which would be irrecoverable. Drs. Totman and McMaster, on behalf of the defendant, said there was no heart murmur, and no displacement, but an irregular heart. The accident was an unusual one. That a live wire should fall at this particular juncture, and hit the plaintiff, knocking him from his wheel, while a possible incident, was certainly out of the ordinary misadventures. As to the legal questions, there are none calling for extensive discussion. There was no proof of any specific negligence on the part of the defendant; nothing showing that the wire was in a condition to be dangerous if it came in contact with a person; and nothing showing a defective construction or careless use of the wire. There is, however, some evidence from which it is urged there was a failure to give adequate inspection. The plaintiff invokes the doctrine of res ipsa loquitur, and that probably will suffice if his story be true. Jones v. Railway Co., 18 App. Div. 267, 46 N. Y. Supp. 321; Volkmar v. Railway Co., 134 N. Y. 418, 31 N. E. 870, 30 Am. St. Rep. 678; O'Flaherty v. Railroad Co., 34 App. Div. 74, 54 N. Y. Supp. 96; Griffen v. Manice, 166 N. Y. 188, 59 N. E. 925. A trolley wire, charged with electricity, hanging down in a public street, would be a condition supporting the presumption that there was some disarrangement in the appliances, however perfect may have been their mechanical construction; and would raise the inference of negligence.

The plaintiff has recovered a large verdict. It depends, in its main features, almost entirely upon his testimony; and it is controverted by facts and circumstances which are not explained away or disputed, and they are too overwhelming, unless cleared up or impaired by contrary testimony, to permit a recovery in this case

to stand.  As was said by Judge Haight in Hudson v. Railroad Co., 145 N. Y. 408–412, 40 N. E. 8, 9:

"But where the evidence which is in conflict, is nothing more than a mere scintilla, or where it is met by well-known and recognized scientific facts, about which there is no conflict, this court will still exercise jurisdiction to review and reverse if justice requires."

That excerpt is quoted approvingly in Laidlaw v. Sage, 158 N. Y. 73–97, 52 N. E. 679–687, 44 L. R. A. 216–225.

The judgment and order are reversed, and a new trial ordered, with costs to the appellant to abide the event.  All concur.